UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

TRICIA LANE,

Plaintiff,

- against -

SALESFORCE, INC.,

Defendant.
-------------------------------------------------------------x

Civ. No.

COMPLAINT

PLAINTIFF DEMANDS A TRIAL BY JURY

Plaintiff Tricia Lane, through her attorneys Vladeck, Raskin & Clark, P.C., complains of defendant Salesforce, Inc., as follows:

## NATURE OF ACTION

1. Throughout Lane's career, and in her first six and a half years with Salesforce, she excelled in sales and leadership, and her supervisors recognized her excellent performance. All that changed in February 2024, when Salesforce dismantled the team Lane had nurtured to excellence, reassigning the team members she had hired and coached to be top performers, as well as the accounts in which she had developed influential senior relationships and revenue pipeline over years, to her younger male peers. In place of Lane's top performing employees and territory, Salesforce gave her two employees with known poor performance, one of whom soon resigned, as well as accounts with known significant customer satisfaction issues and planned attrition. Lane's manager subjected her to sexual and age-based harassment. Lane complained to Salesforce about the hostile work environment. The stress of the hostile work environment affected Lane's health to such a degree that her doctor insisted she go out on leave. When she was ready to return, Salesforce made it difficult for her to do so and impeded her ability

to actually do work. Lane's manager gave her clerical busy-work, and a performance plan with unrealistic goals. Salesforce fired Lane on April 30, 2025, via email.

2. Lane brings this action to remedy gender discrimination, including a hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-1 et seq. ("Title VII"); age discrimination, including a hostile work environment, and retaliation in violation of the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 et seq. ("ADEA"); disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. (the "ADA"); and sex, age, and disability discrimination, including a hostile work environment, and retaliation in violation of the New York State Human Rights Law, N.Y. Exec. Law § 296 et seq. ("NYSHRL"); the New York City Human Rights Law, New York City Admin. Code, § 8–101 et seq. ("NYCHRL"); and the New Jersey Law Against Discrimination ("NJLAD") N.J. Stat. Ann. § 10:5-1 et seq. Lane also brings claims for paying her less than less experienced, younger employees in violation of New York Labor Law § 194 ("NY EPA"), and the New Jersey Equal Pay Act, N.J. Stat. Ann. § 10:5-12(a) ("NJ EPA").

3. Lane seeks injunctive and declaratory relief, compensatory, liquidated, and punitive damages, and all other appropriate equitable and legal relief pursuant to Title VII, the ADEA, ADA, NYSHRL, NYCHRL, NJLAD, NY EPA, and NJ EPA.

## JURISDICTION AND VENUE

4. This Court has subject-matter jurisdiction over plaintiff's Title VII, ADEA, and ADA claims pursuant to 28 U.S.C. § 1331, as those claims arise under federal law. This Court has supplemental jurisdiction over plaintiff's claims under the NYSHRL, NYCHRL, NJLAD, NY EPA, and NJ EPA pursuant to 28 U.S.C. § 1367 because these claims closely relate to her Title VII, ADEA, and ADA claims, having arisen out of a common nucleus of operative facts, such that

all claims form part of the same case or controversy. This Court also has diversity jurisdiction over the NYSHRL, NYCHRL, NJLAD, NY EPA, and NJ EPA claims pursuant to 28 U.S.C. § 1332 as the parties are citizens of different states and the amount in controversy exceeds $75,000.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because defendant resides in this District and plaintiff worked in this District, such that a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PROCEDURE

6. Pursuant to Section 8-502(c) of the New York City Human Rights Law, plaintiff will cause to be served a copy of this Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

7. On February 25, 2025, Lane filed a charge against Salesforce alleging unlawful sex, age, and disability discrimination and retaliation with the United States Equal Opportunity Employment Commission (the "EEOC").

8. At Lane's request, the EEOC issued a Notice of Right to Sue on August 25, 2025.

## PARTIES

9. Lane was an employee of Saleforce for almost eight years, until the company unlawfully terminated her employment on April 30, 2025. Lane is a citizen of New Jersey.

10. Salesforce is a software company. Upon information and belief, Salesforce is incorporated in Delaware and is headquartered in California.

## FACTUAL ALLEGATIONS

### Background

11. Lane is an experienced, highly regarded sales executive.

12. Lane is 64 years old.

13. Lane has an undergraduate degree in communications from Montclair State University and an MBA in business administration and management from Cornell Johnson Graduate School of Management.

14. Lane worked for Microsoft for more than a decade in positions of increasing responsibility. Microsoft promoted her every two years, including one rare double-level promotion. Lane's last position with Microsoft was Global Business Manager. Prior to Microsoft, Lane worked for Lexis-Nexis for over five years, where she was very successful, received numerous awards, and was promoted.

15. Lane then worked for four years as a highly regarded and successful Area Vice President for Teradata.

16. Lane left Teradata after her division was divested, split up, and sold in an asset sale. That same week she was diagnosed with breast cancer and had to have major radical surgery and months of treatment.

17. As Lane was recovering, she was about to accept an offer for a global Vice President position with a company, when a Vice President and recruiter from Salesforce reached out to her to see if she would consider an individual contributor role, managing an extremely challenging nonprofit Enterprise territory.

18. Lane had been in sales management roles and had not been an individual contributor for seven years. But because the Salesforce role would entail less travel, she thought it was better suited to her recovery.

Lane Joins Salesforce and Excels

19. In July 2017, Lane joined Salesforce as an Account Executive in Strategic Enterprise Sales.

20. The territory assigned to her was referred to by everyone on the team as “the territory nobody wanted.” The territory had about 110 accounts, with one third being small foundation accounts for which, at the time, Salesforce had no products.

21. A year later, Salesforce recognized Lane as the top Account Executive in North America and awarded Lane her first Top Performer award for exceeding her quota by over 150%.

22. During the remainder of Lane’s time as an Account Executive, Salesforce continued to recognize her many accomplishments, and asked her to present her best practices to other Account Executives.

Salesforce Promotes Lane

23. In August 2019, Salesforce promoted Lane to Regional Vice President (“RVP”) managing the Eastern Enterprise team, covering the Eastern United States, as far west as Chicago. The Enterprise team sold to the largest nonprofit organizations.

24. When Lane was promoted, the leadership team, including Mark Sichel and Cliff Spitz, told her that the team she was taking over had been leaderless for six months and had been the lowest performing team in the nonprofit business for 11 years.

25. Lane rebuilt the team and turned the team from the lowest performing to the highest performing Enterprise team. She coached and developed Account Executives who had never met their quotas for years into ones who exceeded their quotas.

26. Lane's first supervisor in her RVP role was Area Vice President ("AVP") Spitz, followed by AVP Tom Epes, and AVP Sam Weber. They all gave Lane positive reviews and feedback, merit increases, and stock option grants in recognition of her top performance, and awards for top performers.

27. Weber told Lane that he was working on getting her promoted. But then he left Salesforce in or about April 2023.

28. Lane's next supervisor was AVP Grant Terrell. Terrel also gave Lane positive feedback and a merit increase. Terrell also told her that he was trying to get her promoted.

29. In August 2022, when Kimberly Bradberry joined Salesforce as Senior Vice President for Nonprofit Sales, she requested a one-on-one meeting with Lane. Bradberry opened their conversation by saying, "You have a great reputation, you are known as an overachiever."

30. In 2023 Salesforce invited Lane to the Leadership Excellence Academy, an invitation extended to the top 10% of global sales and solutions leaders, based on performance.

Lane'sTeam is Reassigned, and She Report to a Manager Who Discriminates

31. Salesforce's fiscal years run from February 1 to January 31. Thus, February 1, 2024, was the beginning of fiscal year 2025.

32. As of February 1, 2024, Salesforce realigned the territories. Four of Lane's now high-performing Account Executives were reassigned to other RVPs—her younger, male peers—along with the majority of her team's accounts.

33. Salesforce assigned Lane to a Northeast territory. In addition to Lane retaining two of her old Account Executives, Salesforce assigned Lane four new Account Executives, two of whom had performance issues, one of whom soon resigned. Her team had two open headcounts and two open territories.

34. While Lane worked from her home office in New Jersey, she had clients in New York State and City, with whom she met at their office. She also attended meetings with Salesforce in its New York City office. Salesforce had no office in New Jersey.

35. In February 2024, Salesforce assigned Lane to a new supervisor, AVP Rebecca Temple.

36. Temple gave Lane a quota for year over year growth that Lane did not think was attainable with the clearly underperforming team members and assigned territory issues, in addition to capacity challenges (two open headcounts and new hiring restrictions) that significantly hampered attainment. Lane expressed her concerns and provided analysis to support her assessment, to no avail.

37. There were three other RVPS reporting to Temple: Justin Schumer, who is probably in his early forties; Justin Raisor, who is probably in his late thirties; and Justin Simon, who is probably in his early to mid-forties.

38. It was not long before Lane realized that Temple treated her very differently from Schumer, Raisor, and Simon.

39. Temple repeatedly criticized Lane and blamed her for issues she knew were not Lane's fault, including issues with accounts that pre-dated her responsibility for them. Temple falsely criticized Lane to other employees and to clients.



#1019789

40. Temple did not support Lane when she had to address challenges in her new accounts, and instead made false accusations against Lane, including to Bradberry and President Mike Wolff.

41. Throughout Lane's career, including her time with Salesforce, she had always been extremely accurate in her sales forecasting.

42. Based on the challenges in Lane's new territory, she came up with a forecast that was aggressive under the circumstances. Temple agreed with Lane's projections in their initial February and early March team forecast calls.

43. Temple provided the RVPs with an example of the forecast details she wanted. Lane provided all the details she requested, with a clear executive summary format, as well as additional commentary. In the first forecast call after Temple shared her example, she held up Lane's forecast report as a clear and concise forecast summary, and urged Lane's peers to follow her example.

44. In many weekly meetings, Lane was the only RVP who had their forecasting opportunities updated and aligned with their teams. Temple did not criticize Lane's younger, male peers for their forecasting shortcomings. But once, when Temple knew Lane was out Wednesday to Friday for a medical procedure, she reviewed the forecast information in the app on Monday and prior to when it was due, and harshly criticized Lane for not being fully updated.

45. After Lane worked very hard with her new team, they achieved 109% of the forecast for the first quarter. Temple, instead of recognizing their achievements under challenging circumstances, accused Lane of intentionally submitting an "artificially low" first quarter forecast. She also, for the first time in 12 weeks, criticized the more detailed format Lane provided, the

same format that she had initially praised. Temple criticized Lane in front of her younger, male peers.

46. Temple excluded Lane from business communications and decisions that fell within her responsibility. Her actions created confusion among the Account Executives who reported to Lane and undermined Lane with her team. Temple did not engage in such conduct with Lane's younger, male peers.

47. Temple was often late to her one-on-one meetings with Lane, and sometimes completely missed them. In contrast, Temple made herself available to Lane's younger, male colleagues.

48. On April 25, 2024, Salesforce held a World Tour, a large conference for customers and prospective customers, in New York City. Lane ran into Temple and said hello to her. Lane had back-to-back customer meetings throughout the day, with her day ending with a one-on-one call with Temple at 5:30 p.m. that had been confirmed on both of their calendars and was always a virtual meeting. Lane planned to take the meeting call on her commute home. When Lane got out of her last customer meeting, she saw that she had texts from Temple. Temple asked if Lane was at the World Tour, even though Temple had seen Lane there. Temple also asked what the plan was for their one-on-one meeting. Lane told Temple that she was starting her long commute home and planned to do the meeting during her commute. Temple replied that she was going to skip their meeting and attend a happy hour instead.

49. In at least three calls with Temple in April and May 2024, Lane told Temple that she was concerned about Temple's treatment of her. Lane said she did not feel supported by her, that Temple seemed to look for fault with everything Lane did, rushing to judgment without

any factual basis. Lane also said Temple was targeting her and treating her differently from the rest of the team. Temple refused to acknowledge any of Lane's concerns.

50. Lane also noticed that when Bradberry was in meetings, she treated the men differently. Bradberry joked around with the men and let mistakes slide. She was much more demanding of the women in the meetings.

<u>Temple Threatens Lane's Employment</u>

51. On May 20, 2024, near the end of the day, Temple called Lane. Temple sounded like she was reading a script. Temple told Lane that she was putting her on a Performance Improvement Plan ("PIP") by the end of the week and that Lane's only alternative option was to accept a prompt exit package. Temple falsely claimed she had previously discussed poor performance with Lane and that she had not improved.

52. On May 20, 2024, at 5:42 p.m., Temple sent Lane written comments purportedly describing her performance issues and prior discussions about Lane's performance. The description was full of lies.

<u>Lane Complain of Discrimination</u>

53. On May 20, 2024, before Temple told Lane she was putting her on a PIP, Lane made a complaint to HR about Temple's treatment of her. Lane provided a detailed complaint on May 22, 2024, stating that Temple's accusations against her were false and that she thought Temple was discriminating against her and creating a hostile work environment. Lane provided detailed information about Temple's treatment of her and about her performance. Lane provided additional information to HR on May 24, 2022.

54. Temple's treatment of Lane from March through June 2024 created a hostile work environment on the basis of sex and age, and caused Lane extreme stress. Lane was exhausted

from working long hours in a vain attempt to make Temple happy. Lane could not eat or sleep. Her condition further deteriorated when Temple put her on the false PIP and threatened her employment. Lane told Temple of the health issues she was having, and Temple was aware of prior health issues and medical procedures.

55. On June 10, 2024, Temple submitted written comments making false claims about Lane's performance against the PIP and her performance in general.

56. An employee relations representative and Lane tried to connect on June 13, 2024.

57. On June 13, 2024, Lane sent three emails to Temple, copying Bradberry and Wolff, in which she refuted Temple's accusations about her performance and their supposed discussions about performance. Lane also noted that she had raised concerns about Temple's treatment of her before.

Lane Takes Leave and Salesforce Retaliates

58. When Lane's doctor saw her on or about June 14, 2024, she said that she had never seen Lane like this and that Lane needed to rest and gain weight, especially given her history with cancer. Lane's doctor said Lane needed to take immediate medical leave.

59. Because Lane's doctor put her on leave, Lane emailed the employee relations representative on June 16, 2024. She told him that she was on medical leave because of how she had been treated and provided him with additional information about her claims. Lane said that she thought she was treated differently from her younger, male peers.

60. Lane also learned that Salesforce was hiring much less experienced (younger) employees and paying them more than what Salesforce was paying her.

61. Lane's leave was originally supposed to last until October 15, 2024. In October, her doctor extended her leave to December 15, 2024.

62. On November 12, 2024, Lane's attorney sent a letter to Salesforce, asserting claims on her behalf of violations of civil rights laws.

63. In early December, Lane let Salesforce's benefits department know that she planned to return, as scheduled, on December 16, 2024. HR asked that Lane's doctor fill out a Fitness for Duty Certificate.

64. Lane's doctor submitted the form on December 16, 2024, saying Lane could return to work on December 16, 2024. Lane's doctor requested that, as an accommodation, Lane be allowed to work three days a week in December, four days a week in January, and then resume five days per week on February 1, 2025.

65. Salesforce told Lane that because her doctor asked for an accommodation, even a temporary one, Salesforce would not allow her back at all until her doctor provided additional information.

66. Because of the holidays, Lane could not get her doctor to send a new letter until January 6, 2025. Other than providing a diagnosis, it was not materially different from the form submitted December 16, 2024.

67. Salesforce kept claiming it did not receive Lane's doctor's letter, although her doctor's office repeatedly told Lane they had sent it.

68. Salesforce finally acknowledged receipt, and allowed Lane to return to work on January 21, 2025.

69. Because Lane was ready to return to work on December 16, 2024, her disability benefits ended on December 13, 2024. She had no salary or benefits between December 13, 2024, and January 21, 2025.

70. Lane's first three weeks back at work at Salesforce she diligently tried to log into Salesforce's systems, but faced obstacle after obstacle. Despite Salesforce knowing in early December that Lane was returning, it did not set up anything for her.

71. On February 5, 2025, at 9:43 p.m., Temple started to try to paint a false picture about Lane again. Temple sent Lane an email saying she left a voicemail on Lane's work phone number at 2:29 PM CT and had not received a call back. Temple even sent Lane a screenshot of her attempted call, which showed Lane's personal cellphone number. Lane advised Temple that she did not receive a call or message on her personal phone and reminded Temple that she did not have a corporate phone, because the one she previously had was returned prior to Lane's leave, following Help Desk tickets opened. Lane also described the challenges she had been dealing with trying to connect with the system and noted that she had yet to be provided any guidance as to her fiscal year 2026 team or business for which she was responsible. Temple responded, denying knowledge of the issues with Lane's phone and suggesting Lane had to go to the Help Desk in New York City in person, even though the Help Desk helps employees remotely around the world.

72. Temple continued to try to set Lane up for failure and catch her in errors. Temple denied Lane information that she need to perform her job, and generally was unsupportive of her.

73. In contrast to Temple's treatment of Lane, Lane's team members, and others in the company warmly welcomed Lane back and said they look forward to working with her again.

74. On February 20, 2025, the HR representative assigned to investigate Lane's internal complaint set up a 15-minute call on her calendar at 5:15 p.m. In the video meeting, he said that he was following up on their discussions from last summer and that he/they had "done their due diligence" and did not find anything that violated Salesforce policy. Lane asked how he/they had investigated, as she had not only provided detailed examples of discrimination and a hostile work environment, but a list of employees who could verify the facts she had shared. He said he could not tell Lane anything else, and kept repeating the same sentence about due diligence and finding no policy violation. Lane responded that there could be no question that she was treated differently from mher younger, male peers. She also gave him specific examples of Temple's continued negative treatment in the nine days she had been transitioning back from medical leave.

75. Temple continued to treat Lane worse than her younger, male peers, subjecting her to treatment that the younger men did not have to experience. For example, Temple assigned Lane data entry busy work that she did not assign to the younger men. Temple also assigned Lane administrative tasks with one day to complete, while allowing the younger men several days to complete them.

76. Temple claimed to have relationships with some of Lane's accounts and information about them, but refused to provide Lane with any information or support.

77. On February 25, 2025, Lane filed a charge with the EEOC under Title VII, the ADEA, and the ADA.

78. On or about March 28, 2025, Temple reinstituted the PIP, but changed the specifics of whom Lane should be meeting with, underscoring how arbitrary the requirements were. Lane explained to Temple how the meeting requirements were not possible, and questioned whether any of her younger, male peers had to meet such requirements.

79. Lane exceeded her interim financial plan and came very close to her interim quota, with deals close to closing that would have put her over her quota. None of Lane's younger, male peers were held to a requirement of meeting their interim financial plans or quotas.

80. Despite Lane meeting her financial plan and being just under her monthly goal for her quota, on April 30, 2025, a day Temple knew Lane was out sick, Temple fired Lane via an email. Lane saw the email only after colleagues reached out to her to say that they were sorry to hear that it was her last day with Salesforce.

## FIRST CAUSE OF ACTION
### Title VII: Gender Discrimination

81. Plaintiff repeats and realleges paragraphs 1 through 80 as if fully set forth herein.

82. By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of her employment, including by creating a hostile work environment, on the basis of sex in violation of Title VII.

83. Defendant's conduct showed reckless disregard for plaintiff's statutorily protected rights.

84. Plaintiff has suffered and will continue to suffer irreparable injury and monetary damages as a result of defendant's discriminatory practices unless and until this Court grants relief.

## SECOND CAUSE OF ACTION
### ADEA: Age Discrimination

85. Plaintiff repeats and realleges paragraphs 1 through 84 as if fully set forth herein.

86. By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of her employment, including the creation of a hostile work environment, on the basis of age in violation of the ADEA.

87. Defendant's conduct showed reckless disregard for plaintiff's statutorily protected rights. These violations were willful within the meaning of the ADEA.

88. Plaintiff has suffered and will continue to suffer irreparable injury and monetary damages as a result of defendant's discriminatory practices unless and until this Court grants relief.

<u>THIRD CAUSE OF ACTION</u>
ADA: Disability Discrimination

89. Plaintiff repeats and realleges paragraphs 1 through 88 as if fully set forth herein.

90. By the acts and practices described above, defendant, in violation of the ADA, discriminated against plaintiff on the basis of disability, including by failing to provide reasonable accommodation.

91. Defendant's conduct showed reckless disregard for plaintiff's statutorily protected rights.

92. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendant discriminatory practices.

<u>FOURTH CAUSE OF ACTION</u>
NYSHRL: Discrimination

93. Plaintiff repeats and realleges paragraphs 1 through 92 as if fully set forth herein.

94. By the acts and practices described above, defendant, in violation of the NYSHRL, discriminated against plaintiff on the basis of sex, age, and disability, including creating a hostile work environment and failing to provide reasonable accommodation.

95. Defendant acted with malice and/or reckless indifference to plaintiff's rights protected under NYSHRL.

96. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendant’s discriminatory practices.

## FIFTH CAUSE OF ACTION
## NYCHRL: Discrimination

97. Plaintiff repeats and realleges paragraphs 1 through 96 as if fully set forth herein.

98. By the acts and practices described above, defendant, in violation of the NYCHRL, discriminated against plaintiff on the basis of sex, age and disability, including creating a hostile work environment and failing to provide reasonable accommodation.

99. Defendant engaged in discrimination with willful or wanton negligence, with recklessness, and/or with a conscious disregard of plaintiff's rights or conduct so reckless that it amounts to such disregard.

100. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendant’s discriminatory practices.

## SIXTH CAUSE OF ACTION
NJLAD: Discrimination

101. Plaintiff repeats and realleges paragraphs 1 through 100 as if fully set forth herein.

102. By the acts and practices described above, defendant, in violation of the NJLAD, discriminated against plaintiff on the basis of sex, age, and disability, including creating a hostile work environment and failing to provide reasonable accommodation.

103. Defendant acted with malice and/or reckless indifference to plaintiff's rights protected under the NJLAD.

104. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendant's discriminatory practices.

## SEVENTH CAUSE OF ACTION
Title VII: Retaliation

105. Plaintiff repeats and realleges paragraphs 1 through 104 as if fully set forth herein.

106. By the acts and practices described above, defendant retaliated against plaintiff for her opposition to unlawful sex discrimination, including sexual harassment.

107. Defendant's conduct showed reckless disregard for plaintiff's statutorily protected rights.

108. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendant's retaliatory practices.

EIGHTH CAUSE OF ACTION
ADEA: Retaliation

109. Plaintiff repeats and realleges paragraphs 1 through 108 as if fully set forth herein.

110. By the acts and practices described above, defendant retaliated against plaintiff for her opposition to age discrimination, including age-based harassment.

111. Defendant's conduct showed reckless disregard for plaintiff's statutorily protected rights.

112. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendant's retaliatory practices.

NINTH CAUSE OF ACTION
ADA: Retaliation

113. Plaintiff repeats and realleges paragraphs 1 through 112 as if fully set forth herein.

114. By the acts and practices described above, defendant retaliated against plaintiff for seeking to exercise her rights under the ADA.

115. Defendant's conduct showed reckless disregard for plaintiff's statutorily protected rights.

116. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendant's retaliatory practices.

## TENTH CAUSE OF ACTION
NYSHRL: Retaliation

117. Plaintiff repeats and realleges paragraphs 1 through 116 as if fully set forth herein.

118. By the acts and practices described above, defendant retaliated against plaintiff for her opposition to conduct unlawful under the NYSHRL.

119. Defendant acted with malice and/or reckless indifference to plaintiff's rights protected under state law.

120. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendant's retaliatory practices.

## ELEVENTH CAUSE OF ACTION
NYCHRL: Retaliation

121. Plaintiff repeats and realleges paragraphs 1 through 120 as if fully set forth herein.

122. By the acts and practices described above, defendant retaliated against plaintiff for her opposition to conduct unlawful under the NYCHRL.

123. Defendant engaged in discrimination with willful or wanton negligence, with recklessness, and/or with a conscious disregard of plaintiff's rights or conduct so reckless that it amounts to such disregard.

124. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendant's retaliatory practices.

<u>TWELFTH CAUSE OF ACTION</u>
NJLAD: Retaliation

125. Plaintiff repeats and realleges paragraphs 1 through 124 as if fully set forth herein.

126. By the acts and practices described above, defendant retaliated against plaintiff for her opposition to conduct unlawful under the NJLAD.

127. Defendant acted with malice and/or reckless indifference to plaintiff's rights protected under the NJLAD.

128. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendant's retaliatory practices.

<u>THIRTEENTH CAUSE OF ACTION</u>
NY EPA

129. Plaintiff repeats and realleges paragraphs 1 through 128 as if fully set forth herein.

130. Defendant paid plaintiff less than younger employees for equal or substantially similar work in violation of NY EPA.

131. As a result of defendant's discriminatory pay, plaintiff has suffered lost wages.

<u>FOURTEENTH CAUSE OF ACTION</u>
NJ EPA

132. Plaintiff repeats and realleges paragraphs 1 through 131 as if fully set forth herein.

133. Defendant paid plaintiff less than younger employees for equal or substantially similar work in violation of NJ EPA.

134. As a result of defendant's discriminatory pay, plaintiff has suffered lost wages.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a Judgment:

(a) declaring the acts and practices complained of herein to be violations of the ADEA, ADA, NYSHRL, NYCHRL, NJLAD, NY EPA, and NJ EPA;

(b) enjoining and permanently restraining these violations of the ADEA, ADA, NYSHRL, NYCHRL, NJLAD, NY EPA, and NJ EPA;

(c) directing defendant to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(d) directing defendant to place plaintiff in the position she would have occupied but for defendant's unlawful treatment of her, and making her whole for all earnings and other benefits she would have received but for defendant's unlawful treatment, including but not limited to wages, including back pay and front pay, bonuses, equity, and other lost benefits;

(e) directing defendant to pay plaintiff compensatory damages, including damages for emotional distress, humiliation, pain and suffering, and injury to professional standing and reputation;

(f) directing defendant to pay liquidated damages for its violation of the ADEA, NY EPA, and NJ EPA;

(g) directing defendant to pay plaintiff additional amounts as punitive damages;

(h) awarding plaintiff such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award;

(i) awarding plaintiff the costs of this action, together with reasonable attorneys' fees; and

(j) awarding such other and further relief as this Court deems necessary and proper.

## DEMAND FOR A TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated: New York, New York
November 21, 2025

VLADECK, RASKIN & CLARK, P.C.

By: */s Anne L. Clark*
Anne L. Clark
Attorneys for Plaintiff
111 Broadway, Suite 1505
New York, New York 10006
(212) 403-7300